Ms. 14-3558, Grant Keating v. Nelnet Inc. et al. Oral argument, 15 minutes per side. Ms. Fiorelli for the appellant. May I proceed? Good morning, Your Honors. May it please the Court, my name is Nicole Fiorelli, and I, along with my co-counsel, Patrick Perotti of Dworkin & Bernstein, represent the plaintiff appellant, Grant Keating, in this case. At this time, I'd like to reserve five minutes for rebuttal, please. You may. Thank you. This is a TCPA case involving text messages. The defendant, C. Unet, hired a company to engage in mobile marketing. Text messages were sent. The defendant received notice that texts were sent to those people who did not submit a consent form to receive the texts. Rather than tell the company it hired, stop doing these texts, you aren't authorized to do these texts, they told the company, we accept texts with these types of consents. Basically, do it this way. Two hours later, our client, Grant Keating, received a text message where he did not... Well, wait a minute. Where are you getting that? I mean, there were two suspensions of this program, as I understand it. One occurred on 6, I can't remember my writing, 10, I think it is, and then it occurred again on 7-1, and then it was terminated entirely on September 26th, or August 26th. And at all times, as I understand it, the party that was conducting this campaign had not authorized any texts. Actually, Your Honor, on June 10th, the first instance that you mentioned, and this is at the record 92-2, the page ID is 1339-1340. C. Unet tells Corner Blue, the company it hired, after they've learned of this complaint about the text messages, saying, quote, we do not accept third-party SMS lists to have not opted in specifically to receive text ads. That's not enough consent under the TCPA. So they told Corner Blue, you can text so long as there's this type of consent. They directed the text messaging. Two hours later from when that email came out, Grant Keating received a text message where he did not consent to receive the text. What's your reference to the lower court record you're relying upon there? It's 92-2, really the whole chain of emails. It's an exhibit to a Keel haters deposition. It's page ID. Well, that particular was 1339-1340. But really, 1333-1367 is a ton of email chains between Defendant C. Unet and Corner Blue regarding this text messaging and the pausing and reactivating of the campaign. And the one that you're specifically referring us to within that 1333? 1339-1340, where a Keel hater tells, and I'm going to mispronounce his name, Shaparin of Corner Blue. That's good. That's what I needed. Thank you. Okay, thank you. So the situation we have here is the defendant is directing these texts. They're directing, they're dictating the type of consent that they are requiring for these texts to be sent. Our client then receives a text. The district court found that there's no liability in this situation because there was no agency relationship between Defendant C. Unet and the entity who ultimately sent the text, River City Media. But the question is not be, and should not be, whether or not there is an agency relationship between the defendant, the seller or advertiser of the product, and the company 3, 4, 5 down the line that ultimately pushes the button to send the text. The question should be whether the defendant has control over the text messaging. Are they directing the text messaging? Are they supervising the text messaging? The district court cited to the case How is that different from an agency determination? We don't feel it is different from an agency relationship. The heart of an agency relationship is control, and that's exactly what the FCC has recognized in its ruling where it discusses vicarious liability for the sending of the texts. It's exactly what the case of Thomas v. Taco Bell out of the Central District of California discusses, which, interestingly, the district court actually cited. But if you look at that case, the language that they use in the case, the reason why in Taco Bell the defendant was found not liable was because there was no evidence, quote, and these are the words that the court used, that Taco Bell directed or supervised the texts. Here we have direction from CUNET about sending the texts. We have supervision from CUNET about sending the texts. They're just saying we don't accept text ads where there's not this specific type of consent. Not stop the text messages. They're saying basically if you're going to do it, you have to do it with this type of consent. And under the law, that type of consent is insufficient. So should defendant be responsible for those texts that it directed? And the answer absolutely is yes, and we believe the district court erred by finding to the contrary. Now, notably, that is very consistent with the FCC declaratory ruling in May of 2013, which discusses vicarious liability. Paragraph 37, allowing seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. Again, at paragraph 47, we see no reason that CUNET should not be, I'm sorry, the seller should not be liable under the statute for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of the telemarketers even if that power to supervise it is unexercised. That's directly from the FCC ruling at paragraph 47. Here, CUNET not only had the power to exercise as to whether or not to terminate the campaign, which, as Your Honor noted at the beginning, they paused and reinstated, paused and reinstated a couple of different times during that summer. They not only had that ability, but they exercised that ability. In that situation, that's the heart of agency control. They controlled the offending conduct here. Another case that the district court relied on, Mays v. The Gulf Coast Collection Bureau from May 2013 out of the Southern District of Florida. The court there hold that the defendant was not responsible when it hired a company to engage in collection efforts for it because there was no discussion about text messages being sent. Essentially, the medical provider that hired the collection agency didn't have any control over the text. It had no idea that text messages were being sent. That is not the case here. Defendant CUNET was notified that calls were coming in to its call center and people were complaining that there were no consents for those calls. And they followed up within the organization. Defendant CUNET and Defendant NELNET were emailing each other about these text messages and saying, which campaign is this for? Defendant CUNET identified, this is our text messaging campaign from Corner Blue, the entity that CUNET hired. Rather than anyone saying, this wasn't allowed, this is a breach of a contract, there shouldn't be any text messaging here, their response was, well, let's follow up with Corner Blue and see what the consents were. And then Defendant CUNET wrote the email that I discussed at the beginning, June 10th, saying, we don't accept texts without consent to receive text ads. That was their response. That is authority to send texts. That is direction to send texts. It is direction regarding the heart of the TCPA. There is no TCPA violation unless if the individual who received the text gave express consent to receive it. In courts of health, that means that the individual must have said, I agree to receive texts from X company. It has to be very specific. The defendant here didn't require that. Initially, when the parties first started discussing the texting campaign, they said, well, you need texts for education offers, and that's at the record at 92-2, page 1333. Let me go back here a step just to make sure that I understand this. I'm assuming that a lot of what you're talking about here goes to the question under the FCC declaratory ruling whether the person took effective steps to cease the conduct. Am I right about that? Correct. We have an affidavit in this case that says that I also reiterated to Corner Blue that none of the mobile media marketing campaigns were authorized to involve SMS or text messages, and that CUNET did not accept lead calls generated from SMS or text messages. That's on lower court record 10-13. So I'm gathering that what you're saying is that this affidavit from the representative of, I don't remember who it is, is contradicted by the other email that you referred to earlier. Is that what you're saying? Absolutely, Your Honor. We think that there's definitely factual issues here. There are certainly affidavits from both CUNET and the defendant introduced affidavits from Corner Blue which denied that text messages were permissible at all. We believe that it's a factual question for the jury given the emails. Let me figure out to just put this in context. I'm sure you can clear this up for me. It sounds to me like at the beginning after these complaints started to come in, there was some question about which campaign it even related to because apparently one or more of these companies were running a number of campaigns. Is that correct? Correct. CUNET was involved with multiple campaigns. And some of those, I gather, did use text messages and others did not? Correct. So why, when they don't know which campaign it was, why do you infer that because they're asking about whether there was owner authorization to receive a text message, that has something to do with this particular campaign? Because they knew that the College Quest campaign, the campaign at issue here, was involving text messages. The individual from the call center had contacted Akeel Haider, who's the mobile media strategist in charge of that campaign, and asked what was going on with the text messages. In connection with this specific campaign? Correct. Or one of the many campaigns? In connection with this one and asked what was this? I just looked at 1339 to 1340 and that was not clear to me, so apparently I'm just misunderstanding something. I apologize, Your Honor. 1341, have you got your page ID numbers wrong? 1341, an email from Haider on June 10 to Arthur Schaperion, I guess, at Haider at CUNET, to Schaperion at Corner Blue. The subject matter is the College Quest and text messaging. Correct. That's from 1341, Your Honor, yes. So it's your position that you've got this control mechanism from CUNET conveyed to Corner Blue. Is that sufficient to tag actions by River City? Yes, because Corner Blue hired companies to actually do the text messaging, but they were the contact with CUNET, and CUNET instructed Corner Blue, you can send these types of text messages with this type of consent. And given that consent is key to whether there's liability, that is evidence of sufficient control over the text messaging campaign to import life. What I still don't understand is, at least according to CUNET, the whole campaign being run by Corner Blue involved banners, and there's no such thing as a banner on a text message. That is correct, Your Honor. So at what point, is there any evidence that CUNET ever provided, for example, the content of a text message or even the general parameters of what the text message should have been in line with your theory that they authorized both banners and text messages? There is no evidence that CUNET instructed about the language of the text messages. No, Your Honor, there is not. So they set up a banner campaign. There seems to be no dispute about that. You say they either authorized text messages from the very beginning or, at a minimum, they learned about them as they were going on, and there's not a shred of evidence as to what these text messages that were authorized by CUNET actually would consist of? That's correct. They did not instruct on the language. They instructed that text messages could be sent and the type of consent that was required. And, again, the specific reference to the authorization that text messages could be sent, which seems to me to be completely inconsistent with the contract, is that now it's 1341 or some other place? 1339 to 1340 was an email between two CUNET employees giving notice of the complaint about the text message. Then on 1341 is where we have that language that I quoted, we do not accept third-party SMS lists who have not opted in specifically to receive text ads. But, really, there's a bunch of email chains, and it's 1339 to 1367, which sort of chronicles what happened during that summer. And I see my time is up, Your Honor. Thank you very much. Judge Daughtry, did you have any questions for this counsel? I do not. Thank you. May it please the Court, my name is Jim Wertheim, and I represent the defendant appellees in this matter. Your Honor, with all due respect, I think we're starting at the very wrong place with the whole discussion that has just gone on. The fact of the matter is that CUNET hired Corner Blue to do a banner advertising campaign. I don't know if the Court's involved in this or not, I am not, but a banner advertising campaign shows up on a cell phone or a tablet. You go to a website, and there's something that says, CUNET can offer you information about educational information. You have to click on that. You have to affirmatively do something to engage that activity. It's very interactive. It's a totally different thing than a text message. Whether you think that we're starting in the wrong spot or not, that's where your opposing counsel started us out with. Basically, what she's saying is there's a series of email exchanges between employees of either CUNET or Corner Blue, not sure which, that basically, I gather she's saying it's essentially an admission that this campaign did involve text messages. That's completely incorrect, Your Honor. Why is it completely incorrect? It's completely incorrect for a number of reasons. First of all, I want to start off with River City and CUNET, if I may, for one moment. There's no question that CUNET had no contact whatsoever with River City, had no control over River City, didn't even know River City existed, didn't know what River City was doing until the filing of this lawsuit. Isn't that why she's saying that if CUNET had authorized text messages and once alerted to the fact they were coming in without recipient authorization, they didn't do anything about it, really eliminate the concern about who's actually sending them? It's still under the auspices of CUNET. That's her point. That's her point. I think it's wrong, and I think it's wrong for a number of reasons. The first reason is that I think the control has to be over the sender of the text message, and there is no evidence in the record that CUNET had any contact, any control, any knowledge of the existence of River City until the filing of the lawsuit. I'm struggling with that argument because this is an industry, this communications industry is known, the way it operates is through contracting and subcontracting because you want a subcontractor who has access to more numbers or who has the particular setup to be able to flow auto-dialing that somebody higher up may not. So we know how the industry works, and your position is that I want to get out information to the public, so I may hire one entity and say to them, okay, I need this, I want a banner campaign basically, and then go do it, and if they employ somebody who does text messaging, 100,000 text messages, then the person, the original hiring entity gets to say, oh gosh, I know you wrote me back, and you told me that text messaging was going on, and I said, oh, text messaging is going on, well, be sure that they've given their consent, but I can still pretend like I don't have any authority over them? No, and that's not what I'm saying at all, Your Honor. Well, isn't that what happened? No, it is not at all what happened to you. Help me understand how it's not, because I'm looking at the email. Why don't you just tell us what you are saying. Okay, if you read the email chain and you read through it, what happened was these people are hired to do a banner advertising campaign. Again, it's totally two different things. A banner advertising is not text messaging. It doesn't include text messaging. It can't include text messaging. It's a totally separate thing. So they're hired to do a specific thing. In the course of that project, they get an information that a text was sent, and they inquire because they have no idea why a text was sent in a campaign that had nothing to do with text messaging. What is their inquiry? Their inquiry is to Corner Blue. They have no way of knowing. Corner Blue has never told them that River City exists. They don't know anything about River City. They don't know anything about AKMG. What do they tell Corner Blue can be done? They ask Corner Blue what's being done. If you read the chain email, Corner Blue says, we're confirming we're not allowed to do text messaging, and CNNet says that's correct. I'm looking at that, and it says it's from Heider at CNNet to Corner Blue, and it says, we got a complaint from a user for receiving text messages saying he has never requested it. Can you check this person's number and let me know if he has actually opted into receiving this? We need to provide to him where and how he has opted in and where you obtained his number. Please notice we do not accept third-party SMS lists who have not opted in specifically to receive text ads. What else can you take from that, that they are doing SMS texts to people who have opted in? That's two separate issues, Your Honor. They had campaigns that had text messages. Well, but this one... Not in this... The subject matter counselor of this one says, subject forward college quest, which is the campaigned issue here, and text messaging. But again, Your Honor, you have to understand, and I think if you read the declaration of Mr. Chaparian... Mr. Chaparian received this email. I understand that. But if you read his affidavit as well, if you read the understanding of the two parties, they understood that this was going to be a banner ad campaign. This text comes in and no one understands why because Corner Blue contacted AKMG and told them, gave them the banner ad materials. There was not a text messaging, told them not to text message. I'm struggling with why this series of emails doesn't create a dispute of material fact as to whether CUNET knew that it was engaged in a college quest campaign that included text messaging. Because, Your Honor, if you read the entire scope of all the text messages, if you read all of the communications between the parties, if you read the understanding of the parties, it's very, very clear that text messaging was not allowed. Why didn't Mr. Hader, in response to this information, say, we don't do text messaging, we don't do it at all? But that's not what he said. He said, we don't do it unless you've let us opt in. So that means we do it if you've let us opt in. Am I missing something? Yes, Your Honor. What am I missing? I will grant to you that the communication was not clear, but these are people who are in a business relationship, not in a lawsuit relationship, worried about what the court's going to look at later. If you read the rest of the communications in that chain, there's a line of communication that says, so we're confirming we were not supposed to send text messages, and they say yes. That's when this campaign is returned on. This is all... You were not supposed to... It was returned on when they thought they had permission? No, no, when Corner Blue confirmed that they weren't sending text messages. So all you're saying, as I understand it, is that a text message that, instead of saying don't do it, inquires about whether there was authorization when read in entirety, does not then ratify or authorize sending text messages. That's correct, Your Honor, because, again, they didn't know what was going on here. It's not like they knew Rivers... So let's assume just for a second that on this day of June 10 that somebody could read this and say, as Judge Stranz is asking you, well, gee, it sort of sounds like it's okay to send text messages as long as we have permission to do so. At what point was... Assuming you can read that that way, at what point then was it made clear that they can't? Well... The same day, the next day, when was it? It's our position, Your Honor, that if you read all of the evidence in this case from Corner Blue, who is the agent, if you will, if we're making this our agency discussion, if you read the communications from Corner Blue, they say from day one they knew this couldn't be a text messaging campaign. This is a reaction to something coming in that nobody understands why it's occurring. This is not a ratification of anything. This is an investigation of something nobody understood why it was happening. If you read the... Can you give me a page cite after June 10, 2011, a record cite that says, we don't do this, don't ever do it again? I don't have it here in front of me, Your Honor. I can't give it to you, but it is in the record. In that email chain, there is confirmation that there is not to be text messaging. And if you read Mr. Chaparian's affidavit, which I can give you, which was as part of our exhibit, Corner Blue didn't do text messaging. Corner Blue wasn't a text messaging company. They were a banner ad company. They had only been involved in one text messaging campaign. Mr. Chaparian says Corner Blue had only been authorized one prior time, but at paragraph 17, he says, Corner Blue understood that the College Quest campaign was not to involve the use of SMS or text messages. Corner Blue also understood that it was not authorized to send SMS or text messages for the College Quest campaign. Because of the graphical nature of banner images developed by CUNET, the images could not be used in a text message as a click-to-call. You're reading from the affidavit, right? I am, paragraph 17. That's all we're trying to figure out. And if you don't have it with you, say that. I do not. We don't want to waste any more time. Is there something in the email chain that eventually, after this back-and-forth occurs for a while, says, don't send text messages? Yes, there is, Your Honor. And we would find that, presumably, in the range of emails that were identified by your opposing counsel that I've already misplaced. But it was about 30 pages worth. Yes, Your Honor. So that's where we'll find it? Yes, Your Honor. Okay, thank you. Quite clearly. And I think, Your Honor, the important thing here, as Judge Strachan has indicated, is this theory of somehow setting something in motion and then something else happens and then a text gets sent was actually rejected by the court in Dish as a potential source of liability, in my opinion. At paragraph 31, the opinion says, a number of parties argue that the statutory on behalf of liability extends beyond agency principles to subject a seller to vicarious liability so long as the call is made simply to aid or benefit the seller. There is no evidence in the record at all that CUNET started, asked for, authorized, and permitted a text messaging campaign. I will grant you that down the line somebody sent a text. I will grant you that that person did not even act pursuant to the direction of Corner Blue who said no text messaging. But that doesn't make my client who asked for a banner ad campaign liable, and I would submit even if they find out about it, they don't even know who's doing this. They're trying to inquire. This is not a liability situation where you can have liability simply because something bad happens. And I recognize that it is a difficult balancing issue. How do you respond to the FCC's statements that for a Telephone Consumer Protection Act claim that it's the seller, the original, your entities that are in the best position to monitor and police TCPA compliance by third-party telemarketers because otherwise it leaves the protected group under the Act, which is people like us who don't want to get or pay for text messages, it leaves them without an effective remedy for telemarketing intrusions. I mean, you would concede we have 100,000 text messages in this case. So the question is how do we balance the person who is creating the chain that ends up in all these consumers getting it? Where should the responsibility lie? Their argument is with you. Well, and I would submit to you a couple of things, Renner. There is liability potentially on River City. River City, they could have sued River City. They may have been able to sue AKMG for what AKMG did in starting this campaign. But simply because you ask for a TV ad and someone runs a radio ad, that's very much different than what the FCC is talking about here. The FCC, I believe, is talking about if we had started a text message campaign, if we had gone to Corner Blue and said, we want you to send text messages, and River City down the road sends them, I would submit that we could potentially be liable. Potentially, depending on facts. But not when I ask you to do a banner ad campaign that doesn't involve text messages that I could be liable for someone sending a text message down the road. And you would take that same position even if the practice in the record is that you enter a generic contract and then you control the activities of the people you contract with by direct communication throughout the campaign? Yes, Your Honor. I do take that position because I don't think you see any evidence in the record. There is no evidence that has been presented to the court where CUNET says, we want to send text messages for the College Quest campaign to any of the parties in this line of communication. There is a response to the fact that one was sent. There is not a request. And even if you read Mr. Hader's email on that specific day carefully, it's not saying, we're telling you to send these messages. It's saying, when we send them, we don't understand what's going on here. This was sent. Why was it sent? And so I think that's very much different than a company starting a campaign, which is, there's no evidence in the record here that CUNET started a text messaging campaign ever or told anyone to send text messages on its behalf. And in fact, if you look at the text that was sent, it doesn't mention College Quest anywhere. It's not what CUNET had provided to its person, its corner blue, to start its campaign. Chaperion says in an email to Hader on June 16, quote, as Michael confirmed, we will not be doing any SMS marketing for these campaigns, end quote. Is that the don't do it email that you were thinking about? Yes, Your Honor. When it says we will not be doing any SMS marketing, that's what is at issue in this case, right? Correct. So I've got the terminology. Yes, sir. Yes, sir. And again, you have to understand, they're reacting to something that nobody expected. The language is not perfect, but it's not, there's nothing that says, please send texts on our behalf. It's quite the opposite is what you just read. This is not to go on. This is not authorized. So, I mean, interestingly enough, I don't mean to suggest anybody should read a lot into it, but apparently the plaintiff here, Keating, got this text message on June 10th, which was almost contemporaneously with when somebody here was receiving a complaint, not from Keating, but from somebody else named Hodge, right? Correct, Your Honor. And again, even if you wanted to take this to some extreme that I don't think is authorized by the statute, the law, or even the FCC's interpretation, there's no evidence that we could have done something, since we didn't even know this river city existed, to stop them from sending these other texts in the time period in which we learned about it and acted. I mean, in fairness to the other side, you could have instructed Corner Blue more specifically and more directly and more quickly to find out whoever is sending these and tell them to knock it off. Well, Your Honor, I don't know what... Certainly, I mean, you could always... Even if you read anything into these other emails, we're talking about this six-day period. Well, again, though, Your Honor, I don't think there is liability for not reacting fast enough to something you didn't know was going on. Did Keating receive multiple text messages or just the one on the 10th? Just one. And again, I don't know where the liability relates to the law for not reacting fast enough to something you learned that you had no idea was going on. That's not what the TCPA is. Judge Chance, do you have any questions? Judge Daughtry, any questions? No, thank you. All right, thank you, Mr. Bertheim. Ms. Fiori, you have a couple of minutes left. Thank you, Your Honor. My name is Patrick Perotti with the work under Bernstein. We're not asking for a broad rule here that says that if there's a mistake made, someone sends text messages on your behalf without your knowledge, you're liable. We're saying that when a company has specific notice that it has a campaign, and defense counsel did not give you the correct information from the record, the contract says mobile marketing. It does not say banner ads. The only thing that says banner ads is the affidavit that they submitted after the lawsuit was filed. When they were asked in deposition, what does the mobile marketing contract mean, they said mobile marketing includes text messages. Please look at Exhibit Page 1333, which is from March, before this ever started, and it specifically is an email to this company, to Corner Blue, asking them to bid on campaigns which include, quote, click-to-call campaigns, display banners, and no third-party SMS lists without consent to education offers. That's a text message campaign, and it specifically indicates that College Quest is the campaign that's available. Excuse me, this is Judge Daughtry. I'm looking at Page 1333, and you're going too fast. I'm sorry. March 29th, from Akeel Heider, of the defendant, to the company, Mr. Catch-a-try-on, whatever his name is, and it offers them different campaigns that they can get involved in, and specifically, the College Quest campaign is one of the campaigns that has banners and SMS text messaging so long as there is proper consent. The problem is the proper consent they told them to get wasn't the right consent, and the issue about, well, what about this, what about, and I think, Judge Strachan, you hit it right on the head. How do we know it wasn't the proper consent? Because you cannot have a proper consent under the TCPA unless you have consent not only that you agree to receive contacts from an auto dialer and specifically the name of the company that's going to be contacting you, there's the name of the seller, and what type of text messages you're going to get. You have to have all of those. And what the federal government said was... Okay, excuse me. You are getting ahead of me again. Can we go back to Page 1333? Yes, ma'am. I see the campaign College Quest, CQ, Mobile LT Design, National, payout $2 per lead. Now, what else is there that you say? 1333? I'm sorry? 1333? Yeah. 1333 says, have three new offers coming this week. Let's see if we can start with the above and how the quality of the traffic is. Click-to-call campaigns, no links directly from display banners, and no third-party SMS without consent for educational offers. That's a text message campaign. And the consent that they directed their agent to get was an illegal type of consent under the federal law. Okay. So, the click-to-call campaign, no links directly from display banners, and no third-party SMS list without... Where am I going to find somewhere in the record what that means? The deposition of the representative from CU-Net, Akil Heider, explained exactly what these things mean, indicated that SMS campaigns are text message campaigns. Yes, I understand that. But where is that affidavit? There's no affidavit. It's his deposition testimony. Oh, okay. Where is the deposition testimony? 92-2. 92-2. Yes, ma'am. Thank you. And the key is that the... I mean, this is... The liability here is we're suggesting this is a question of control and management. And so they have a campaign which they... And again, Judge McKeague, timing is everything here. When they got the contact that says, on this campaign, text messages are being sent, and they're being sent unlawfully, that's what that email tells them. We're getting complaints. Instead of shutting it down, as you indicated at the very beginning, that they had the power to do it, and in fact they did it three different times, they didn't shut it down. They wrote back, they said, okay, but you may have to make sure you get educational consent. That's the wrong kind of consent. And I suppose I can sum it up with... But hold on a minute. Now, my understanding, and so correct me if this is wrong, that they did deactivate the click-to-call campaign after they got that word that these messages are going out. Now, they did reauthorize it. No, you have this sequence incorrect. When they got the first contact, when the defendant got the first contact by email that said, texts are going out and they're being sent illegally, their response, as you said, Judge, wasn't shut it down, don't do it anymore. Their response was, okay, do it, but make sure you get educational consents. Then when did they cut it off? They cut it off a couple of days later. And our client got it after the actor, the corner blue actor, was given the information, yes, make sure when you do this you get educational consents, and that's the last thing I want to say is that when they asked the company, well, who's, as the federal government said, you have to supervise this. We said, who's supervising this? They said, Mr. Hyder is. So we deposed Mr. Hyder and we said, Mr. Hyder, are you in charge of this, supervising the TCPA? And he said, what, me? Who told you that? We said, do you know what the TCPA even is? He said, I don't even know what that law is. This is a multi-billion dollar company. This isn't a small company. This is a publicly traded multi-billion dollar company that's doing this, and it responds to a federal mandate by Congress that it's to supervise these type of things by having the person who's in charge say, we're going to let you send these kind of ads with this type of consent, and we ask them, well, is that enough? They said, I don't know. I don't even know what the statute says. One thing that I'm curious about here is this plaintiff is apparently a partner or an associate of yours in your law firm. Associate. How many, this is a putative class action, but it didn't get that far, right? Yes, it has not been certified. You must have some reason to believe how many of these unauthorized text messages were sent out, either unauthorized in the sense they shouldn't have been sent out at all, or they should have been sent out, as you're claiming, but with the wrong consent protocol. Yes, sir. That is $40,000 for the one aspect of it and $100,000 for the other aspect of it. And again... What do you mean aspects? In other words, the one bank of time. So this June 10 to June 16 timeframe, that's the 99,000 number of text messages that went out and you say 40-some thousand of them did not have appropriate authorization? This isn't really the way we do it. We really don't even let you stand up and continue this argument without us knowing about this in advance. No, we did note that. I didn't know that. I'm sorry, sir. It was $40,000 during the June 10 and 11 period and then thereafter there was another $60,000 for a total of $100,000. And our only contention here is... So $100,000 from June 10 to 11, that's when your associate got here. $40,000. $40,000, okay. And then the $100,000 is what? Total. And that was all the text sent in this campaign after that, which would be about another $60,000. All right. And basically this seeks, what, $100 per or $500 per text message? It seeks... I believe it's discretionary on the trial court, but it's whatever Congress said. It's like $100 per message or $500. I'm not sure exactly what the liquidated amount is in the statute. You're pursuing this all the way to the Court of Appeals and you don't even know what the damages are? I don't know what the actual damages are going to be, no, because that's, again, up to the discretion of the district court judge. Okay. Thank you. Any further questions, Judge Stranz? No, thank you. Judge Daughtry? No, thank you. All right. Thank you. Case will be submitted. You may adjourn the court. This honorable court is now adjourned.